# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-22882-CIV-SCOLA

DANIEL VALDERRABANO TORRES, and
all others situated,

        Plaintiff,

vs.

ROCK & RIVER FOOD, INC., d/b/a
Marumi Sushi, and Teruhiko Iwasaki,

        Defendants.

_____

January 26th, 2016
8751 West Broward Boulevard
Suite 105
Plantation, Florida
9:05 a.m.

DEPOSITION

OF

DANIEL VALDERABANO TORRES

Taken before CAROL ARLOTTA, Registered
Professional Reporter and Notary Public in and for the
State of Florida at Large, pursuant to Notice of Taking
Deposition filed in the above cause.

```
1    APPEARANCES:

2    STEPHEN M. FOX, JR., ESQUIRE
     OF:    J.H. ZIDELL, P.A.
3           300 71st Street
            Suite 605
4           Miami Beach, Florida 33141
     Appearing on behalf of the Plaintiff
5
     CHRIS KLEPPIN, ESQUIRE
6    OF:    GLASSER & KLEPPIN, P.A.
            8751 West Broward Boulevard
7           Suite 105
            Plantation, Florida 33324
8    Appearing on behalf of the Defendants

9

10                            - - - -

11

12                         I N D E X

13                                              Page

14
     Direct Examination By Mr. Kleppin          3
15   Cross Examination By Mr. Fox               79
     Redirect Examination By Mr. Kleppin        79
16
                      E X H I B I T S
17
     Defendant's Exhibit Number 1              41
18

19

20

21

22

23

24

25
```

```
 1        Q.   Well, just spell it slowly.  Let's enunciate
 2   clearly here today.  There's no sense in confusing
 3   anybody.
 4        A.   It's D-A-N-I-E-L.
 5        Q.   A middle name or a next name, whatever the
 6   case might be?
 7        A.   It's V-A-L-D-E-R-A-B-A-N-O.
 8        Q.   So one R?
 9        A.   Yes.
10        Q.   And do you have any other names or a last
11   name?
12        A.   Last name.
13        Q.   And how do you -- And what is that last name?
14        A.   It's T-O-R-R-E-S.
15        Q.   Okay.  Mr. Torres, have you ever given a
16   deposition before?
17        A.   I don't understand the question.
18        Q.   Have you ever been asked questions in a legal
19   proceeding like this one today before?
20        A.   Yes.
21        Q.   And when was that?
22        A.   I don't remember.  I don't remember.
23        Q.   What type of proceeding was it?
24        A.   It was overtime.
25        Q.   Okay.  And you sued someone before for
```

```
 1    overtime?
 2         A.   Yes.
 3         Q.   How many times?
 4         A.   One time.
 5         Q.   And what is the name of the employer that you
 6    sued before for overtime?
 7         A.   I don't remember.
 8         Q.   Well, was it -- What kind of business was it?
 9         A.   It's a buffet, a restaurant buffet.
10              THE INTERPRETER:  Excuse me.  The interpreter
11         needs a second.
12              (Thereupon, a discussion was had between the
13         interpreter and the witness.)
14         A.   Mykonos.  Mykonos.  That's the name of the
15    restaurant.
16         Q.   Oh, Mykonos.  Is that a Greek restaurant?
17              THE WITNESS:  (In English)  No, Japan.
18         Q.   Oh, Japanese?
19         A.   Japanese.
20         Q.   And so what work did you do at the
21    restaurant?
22         A.   Sushi.
23         Q.   And how long did you work there?
24         A.   Nine months.
25         Q.   And were you paid hourly?
```

```
 1        A.   Yes.

 2        Q.   How much per hour?

 3        A.   $8.  $8.

 4        Q.   Per hour?

 5        A.   (Witness nods head in the affirmative.)

 6        Q.   Yes?

 7        A.   Yes.

 8        Q.   And how many hours, approximately, were you

 9   working a week at that restaurant?

10        A.   60.

11        Q.   Now, did you punch a time card at Mykonos,

12   the restaurant?

13        A.   Yes.

14        Q.   And did you yourself punch the times on the

15   time card?

16        A.   Yes.  We did it with a machine.

17        Q.   Did you use Mr. Zidell's law office as your

18   lawyer to sue Mykonos?

19        A.   Yes.

20        Q.   And how long ago did you bring that suit?

21        A.   I couldn't tell for sure.  I don't remember.

22   It was about six months.

23        Q.   Okay.  So about six months ago?

24        A.   Yeah, give or take.

25        Q.   And did the case settle?
```

```
 1        A.    I don't understand.

 2        Q.    Okay.  Did the case resolve?

 3        A.    Are you talking about that last case --

 4        Q.    Yes.

 5        A.    -- or are you talking about this case?

 6        Q.    The last case.

 7        A.    Yes.

 8        Q.    And don't -- I'm not asking you at this point

 9   how much it resolved for, but you got money, correct,

10   from the restaurant?

11        A.    I can't answer that question.

12        Q.    Well, you sued the restaurant for overtime.

13   Was that your only claim?

14        A.    Yes.

15        Q.    And are you aware under the overtime statute,

16   the only relief you could get is money?  You can't get

17   anything else.  You're aware of that?

18        A.    Yes.

19        Q.    And so apparently you don't want to say

20   today -- and I'm not asking you -- don't disclose the

21   amount, but the point is, you received some amount of

22   money from Mykonos when you settled?

23        A.    Yes.

24        Q.    So you worked at Mykonos, you sue them for

25   overtime, you get money, and then you go work for
```

```
 1        Q.   Now, knowing that you've sued a restaurant
 2   months ago for overtime, and received it, you then
 3   obviously know that you're owed overtime if you work
 4   more than 40 hours in a week; right?
 5             THE INTERPRETER:  The interpreter needs you
 6        to repeat the question, please.  I'm sorry.
 7             MR. KLEPPIN:  Okay.  No problem.
 8        Q.   Months ago -- A long time ago, you worked at
 9   a restaurant, Mykonos, and you knew that you could sue
10   them for overtime, so then you obviously know that if
11   you work more than 40 hours in a week, you are
12   potentially entitled to overtime; correct?
13        A.   Yes.
14        Q.   What do you earn at your current job?
15        A.   800 pesos every 14 days.
16        Q.   And 800 -- Oh, so that $800 a week, is that
17   your rate of pay?
18        A.   No, no, no.  Every two weeks.
19        Q.   Every two weeks, it's $800?
20        A.   Yes.
21        Q.   So apparently you're being paid $400 a week
22   or $10 an hour?
23        A.   Yes.
24        Q.   Are you paid in a check or are you paid in
25   cash at your current job?
```

```
 1    charge you simply to cash your check?
 2         A.   No.
 3         Q.   Now, when you got the job at Inverrary
 4    Rentals, LLC, did you fill out an I-9 Form and give
 5    them your Social Security number?
 6         A.   I don't have one.
 7         Q.   Okay.  So you're saying then -- Well, did
 8    they ask you for one?
 9         A.   Yes, but I don't have one.
10         Q.   Well, did you give them fake information or
11    did you just tell them I don't have --
12              MR. FOX:  Object to form.
13         Q.   -- the information you're seeking?
14         A.   No, sir.  I spoke out.  I told them I didn't
15    have one.
16         Q.   Okay.  So you told them, hey, listen, I can't
17    work in this country legally, but, you know, I want the
18    job anyway, will you hire me?
19              MR. FOX:  Object to form.
20         A.   It didn't come to that.
21         Q.   What do you mean it didn't come to that?
22         A.   That they just hired me.
23         Q.   Have you ever filed an income tax return in
24    the United States?
25              MR. FOX:  Object to form.
```

```
 1        A.    No.
 2        Q.    How long have you worked in the United States
 3   full time?
 4        A.    What do you mean, how long have I been
 5   working in the United States?
 6        Q.    Yes, full time.
 7        A.    I don't know if you're asking me if -- how
 8   long have I been here or how long have I been working
 9   here?
10        Q.    I see.  Okay.  Let's just start with, I
11   guess, where were you born?
12        A.    Tihuatlán, Veracruz, Mexico.
13        Q.    And when did you come to the United States?
14        A.    2006.
15        Q.    How did you get here?
16        A.    Walking.
17        Q.    Like walking across the border in the middle
18   of the night, that type of thing?
19              MR. FOX:  Object to form.
20        A.    Yes.
21        Q.    Did you hire a coyote?
22              MR. FOX:  Object to form.
23        A.    Yes.
24        Q.    How much did you pay?
25        A.    $3,000.
```

1    in the last ten years since you've been in the country,

2    you've been working here?

3         A.   Yes.

4         Q.   And most of that time, you've worked full

5    time, 40 hours or more in a week generally?

6         A.   How do you mean, the time I've been working

7    40 hours?  What are you saying?

8         Q.   Yes.  By and large, for most of the ten year

9    period of time, the vast majority of it, you've been

10   working at least 40 hours a week; right?

11        A.   It's been more.

12        Q.   Okay.  And so you typically -- You've earned

13   then, in the last ten years, anywhere between what,

14   $8 and $10 an hour?

15        A.   Yes.

16        Q.   And you've never once, in that ten year

17   period of time, ever filed a federal income tax return

18   with the United States; correct?

19        A.   No, I've never filed one.

20        Q.   Now, what is your address?

21        A.   I don't remember, but it's Northwest -- It's

22   the same address where the apartments are that I work

23   in.

24        Q.   Okay.  Apparently you work at this Inverrary

25   Rentals place?

```
 1              Oh, I see.  You have that written down
 2    somewhere?  That would be helpful.  Oh, it's the same
 3    business card, you're showing me?
 4         A.   Yes, the same address.
 5         Q.   Oh, okay.  So your address is 2979 Northwest
 6    56th Avenue, and what apartment number do you live in,
 7    sir?
 8         A.   35C-1.
 9         Q.   Okay.  Thank you very much.  Have you ever
10    been arrested?
11         A.   No.
12         Q.   Do you have a driver's license?
13         A.   No.
14         Q.   Have you ever attempted to get a driver's
15    license?
16              MR. FOX:  Object to form.
17         A.   No.
18         Q.   Have you ever driven a vehicle in the United
19    States?
20         A.   Yes.
21         Q.   Did you drive a vehicle to get here today?
22         A.   No.
23         Q.   How did you get here today?
24         A.   I was brought here.
25         Q.   By who?
```

```
 1        A.    A friend.

 2        Q.    Now, do you own -- Do you own or lease or

 3   borrow a car currently?

 4        A.    No.

 5        Q.    How many times have you driven in the United

 6   States?

 7              MR. FOX:  Object to form.

 8        A.    I don't remember.

 9        Q.    Is there a period of time that you did have a

10   car or access to one where you could drive?

11        A.    No.

12        Q.    When was it then that you were driving?  Is

13   it off and on during the ten years that you've been

14   here, or just one period of time for a year or two you

15   were driving?  Could you explain?

16              MR. FOX:  Object to form.

17        A.    To go to the store.

18        Q.    So like you borrowed a friend's car or did

19   you have your own car to go to the store?

20        A.    No, I borrowed a car.

21        Q.    And how many times have you done that, just

22   off and on when you needed?

23              MR. FOX:  Object to form.

24        A.    When I needed it.

25        Q.    Now, have you ever had insurance on a car in
```

1    case you got in an accident, the insurance company then

2    could pay for any sort of injury or repairs necessary?

3        A.   If I don't have a car, I don't have

4    insurance.

5        Q.   Well, you can go rent a car, borrow a car,

6    and you can get car insurance when you rent or borrow a

7    car for a temporary period of time.  Are you aware of

8    that?

9        A.   I don't know because I've never had a car.

10       Q.   Now, are you aware that it's unlawful in this

11   country to drive a car without a driver's license?

12            MR. FOX:  Object to form.

13       A.   Yes.

14       Q.   But apparently your need for convenience to

15   be able to get to certain places outweighs the risk of

16   potentially getting caught and arrested for driving

17   without a driver's license?

18            MR. FOX:  Object to form.

19       A.   I would never borrow the car for more than 20

20   minutes to drive to the store and back.

21       Q.   Is the answer to my question yes, with that

22   explanation?

23       A.   Yeah.

24       Q.   Now, with respect to the filing of the income

25   tax returns, you certainly know that you have to file

```
 1              MR. FOX:  Object to form.
 2         A.   If I had the papers, yes.
 3         Q.   I see.  So you're saying if the federal
 4    government gives you the right to work in this country,
 5    then you'll consider paying your income taxes?
 6              MR. FOX:  Object to form.
 7         A.   Yes.
 8         Q.   Now, do you intend to pay the back taxes that
 9    you owe for the last ten years of working all these
10    years?
11         A.   If I could, yes.
12         Q.   Well, if you could, meaning if you had the
13    money.  But you don't have the money, so you're not
14    going to pay the back taxes ever, are you?
15              MR. FOX:  Object to form.
16         A.   No.  If I -- What I meant to say, when I said
17    "if I could," if the government gave me the paperwork
18    to pay it, I would pay it.
19         Q.   Well, do you know how much you owe the
20    government for all the last ten years of work that
21    you've done?
22         A.   No.
23         Q.   You've never even attempted to calculate it,
24    have you?
25              MR. FOX:  Object to form.
```

```
 1        A.   No.

 2        Q.   And that's because you don't intend to pay

 3   it.

 4             MR. FOX:  Object to form.

 5        A.   If I had papers, I would know my balance, but

 6   I don't have one.

 7        Q.   Well, you have a general idea of what you've

 8   earned each year.  You said it was -- in the last ten

 9   years, it's been between $8 and $10 an hour.  So you

10   must have some idea which jobs and which months you've

11   worked, and what hours you were working, to at least

12   provide an estimate -- to calculate an estimate of what

13   you would owe; correct?

14        A.   No.

15        Q.   What's your phone number?

16        A.   (754) 368-0617.

17        Q.   How long have you had that telephone number?

18        A.   I don't remember.

19        Q.   Is that a cellular number?

20        A.   Yes.

21        Q.   Did you have a cellular number before that

22   one?

23        A.   Yes.

24        Q.   And what was that phone number?

25        A.   I don't remember.
```

```
 1   again, two years?
 2        A.   No, nine months.
 3        Q.   And you don't remember the person you worked
 4   with day in and day out for nine months?  You don't
 5   remember his name?
 6        A.   No.
 7        Q.   Now, when you were -- When you got the job,
 8   did you tell that manager, hey, look, I don't have a
 9   bank account, can you please pay me in cash so I don't
10   have to, you know, pay the check cashing store fees?
11             MR. FOX:  Object to form.
12        A.   No.
13        Q.   Were you paid in cash by Mykonos?
14        A.   No.
15        Q.   You were paid by check?
16        A.   Yes.
17        Q.   And so then you'd have to go down to the
18   check cashing store and, of course, pay the big fee in
19   order to turn the check into cash; right?
20             THE INTERPRETER:  Sorry.
21             MR. KLEPPIN:  Go ahead.
22        A.   Yes.
23        Q.   How much are those fees?  Is it like five,
24   ten percent of the amount of the check?
25        A.   It depends.
```

```
 1        Q.   But that's like a range that's typical, five
 2   to ten percent?
 3        A.   Yes.
 4        Q.   So if you could, obviously -- You'd rather
 5   not have to pay that money to the check cashing store,
 6   so you really would prefer to be paid in cash.
 7             MR. FOX:  Object to form.
 8        Q.   Correct?
 9        A.   Yes.
10        Q.   And so when you apply for work, isn't that
11   the first -- one of the questions that you'll ask is,
12   hey, is there any way you can pay me in cash?
13             MR. FOX:  Object to form.
14        A.   No, sir.  I just want to work.
15        Q.   Now, do you have any credit cards?
16        A.   No.
17        Q.   So you really live in a cash world, correct,
18   one in which you pay for things in cash?  You want to
19   receive cash, and if you don't, if it's a check, you've
20   got to turn that into cash; right?
21        A.   No.  Just -- I don't care how I get paid.
22        Q.   No.  But if you don't have a bank account,
23   you have to use a check cashing store if anyone ever
24   gives you a check.  You don't have a credit card.
25   You're unable to pay bills via a check or something
```

1    Q.   Well, whether they speak English or not, if

2  you don't speak English, then the three of you can't

3  communicate in English, see?  That's the point.

4    A.   For work, you don't need that much English.

5    Q.   Well, I didn't ask, though -- The question I

6  asked wasn't tell me how much English you really need

7  to speak while you're working with them.  I just simply

8  asked, they don't -- You don't speak English.  You

9  think they do to some degree.  So, therefore, you're

10  not able to effectively communicate with them in

11  English.  Now, that's all I'm asking.

12    A.   No.

13    Q.   Okay.  So you had identified then -- You had

14  said to me -- When I was just asking specifically who

15  spoke what languages, you volunteered that you used --

16  there was another employee that would interpret or

17  translate between you and Mr. Iwasaki and Mr. Hayakawa;

18  correct?

19    A.   Yes.

20    Q.   Who was that person?

21    A.   Romeo.

22    Q.   Does Romeo have a last name?

23    A.   Telles.

24    Q.   Is Romeo Telles related to Israel Telles?

25    A.   They're brothers.

```
 1          Q.   Are you friends with Romeo Telles today?
 2          A.   Yes.
 3          Q.   Does Romeo Telles still work for
 4    Rock & River?
 5          A.   Yes.
 6          Q.   What position does Mr. Telles have there?
 7          A.   I don't know at this time right now, but I
 8    know he was a dishwasher.
 9          Q.   Did Israel Telles ever work for Rock & River?
10          A.   Yes.
11          Q.   When you worked there?
12          A.   Yes.
13          Q.   And when did he leave?
14          A.   I don't know.
15          Q.   Before or after you?
16          A.   Before me.
17          Q.   Do you know why Israel Telles left?
18          A.   I don't know.
19          Q.   Did he quit?  Was he fired?
20          A.   I don't know.
21          Q.   Do you know where Israel Telles lives now?
22          A.   I don't know.
23          Q.   So when Israel Telles said, hey, listen, if
24    you got fired from Mykonos, you should come and work at
25    Rock & River, is that because Israel Telles worked
```

1    there at the time?

2        A.    Yes.

3        Q.    Now, Israel Telles must have liked his job

4    there if both he and his brother are working there, and

5    then they recommended you should come work there, too.

6        A.    When Israel was working, Romeo wasn't working

7    there.

8        Q.    Okay.  But Israel Telles would have told you,

9    hey, look, Daniel, you just lost your job at Mykonos.

10   Come and work at Rock & River.  It's a great job.

11       A.    No.  That's not how he phrased it.

12       Q.    Well, you considered Israel Telles -- I

13   thought you told me before you considered him to be

14   your friend; right?

15       A.    Yeah.

16       Q.    So a friend isn't going to tell you to go

17   work at some job that's a bad job, it doesn't pay well

18   or something like that.  They're only going to

19   recommend a job to you that's a good job.

20       A.    He just told me to go check it out.  I mean,

21   he never told me if it was a good or a bad job.

22       Q.    But do you think a friend of yours would lure

23   you into getting some terrible job, one in which

24   workers are taken advantage of and this sort of thing?

25   Friends don't do that to each other, do they?

```
 1              MR. FOX:  Object to form.
 2         A.   It depends on the person.
 3         Q.   Well, you had said, though, that Israel
 4    Telles was a good friend of yours, not some bad friend,
 5    enemy, who was trying to stab you in the back.  So
 6    Mr. Telles would not have recommended you go check out
 7    Rock & River and get a job there if they didn't pay
 8    appropriately.
 9              MR. FOX:  Object to form.
10         A.   I said friend.  I didn't say good friend.
11         Q.   Okay.  But you said friend, not enemy.
12         A.   Yes.  But you're misinterpreting.  One thing
13    is a friend, and another thing is a good friend.
14         Q.   Oh, I see.  So Mr. Israel Telles is not a
15    good friend, he's just a friend?
16         A.   Yeah.
17         Q.   Did you ever -- After you accepted the job at
18    Rock & River, did you ever go to Israel Telles and say,
19    this is not a good job, why did you lure me here and
20    tell me to check this place out?
21              MR. FOX:  Object to form.
22         A.   No.
23         Q.   Did you ever complain to Romeo Telles about
24    anything at all at Rock & River with respect to your
25    job?
```

```
 1        A.    No.
 2        Q.    Now, wasn't Israel Telles paid overtime if he
 3   worked it?
 4        A.    I don't know.
 5        Q.    Wasn't Romeo Telles paid overtime if he
 6   worked it?
 7        A.    I don't know.
 8        Q.    You never bothered to ask them?
 9        A.    No.
10        Q.    Now, wasn't there a little place at
11   Rock & River where all the time cards were kept so that
12   the employees could write down the times that they
13   started and the times that they ended their shifts?
14        A.    They had it on a table there for everyone to
15   see.
16        Q.    Oh, okay.  So the time cards for each
17   employee were on a table?
18        A.    Yeah.  They were all there.
19        Q.    And so each day then when you would start
20   working, you would find your time card and write the
21   time down that you started?
22        A.    Yes.
23        Q.    And then you would also write down the time
24   that you stopped working, at night or whenever it was?
25        A.    Yes, when I got there and when I left.
```

```
 1        Q.   Okay.  So with respect to -- If we wanted to
 2   go back and look and see how many hours you worked on
 3   any given day or week, we would just look at the
 4   company's time and pay records to determine that;
 5   correct?
 6        A.   Yes.
 7        Q.   So those records then are accurate?
 8        A.   Yes.
 9        Q.   Now, you never punched out for any breaks
10   that you took; correct?
11        A.   I don't remember.
12        Q.   Did you ever punch back in when your break
13   might have ended?
14        A.   I don't remember.
15        Q.   I know it's been a while.  It's been a few
16   months since you've worked there and so forth.  So I
17   take it as you sit here today, you really don't have
18   much of a recollection on any given day or week, what
19   breaks you would have taken or not taken?
20        A.   Yeah.
21        Q.   "Yes," meaning you just don't have the
22   recollection?
23        A.   No.  I don't remember.
24        Q.   Are you aware of any discovery responses
25   that have been served in this lawsuit by Rock & River
```

```
 1              THE INTERPRETER:  Okay.  I'd like, off the
 2        record, to explain it, if that's okay.
 3              MR. KLEPPIN:  Well, you can explain it to
 4        him.  When you're talking with him, she's not
 5        going to be taking down what you're saying in
 6        Spanish, so --
 7              THE INTERPRETER:  Oh, no.  I -- Okay.
 8              MR. KLEPPIN:  Go ahead.
 9              THE INTERPRETER:  But I was just -- pointed
10        that out.
11        A.    (Continuing)  From the previous lawsuit?
12        Q.    No.  Let's just stick with this lawsuit,
13   okay?  Are you aware of any information that
14   Rock & River has requested of you in this lawsuit?
15        A.    Yes.
16        Q.    And what is it that they've asked you for?
17        A.    Oh, you mean the plaintiffs are asking
18   something from me?
19        Q.    I'm asking, are you aware -- Have the
20   defendants asked you to answer certain questions in
21   writing or to provide any documents to them?  I just
22   want to know if you're aware of that one way or the
23   other.
24        A.    No, no, no.
25        Q.    They haven't?
```

1      A.   No.

2      Q.   Okay.  Now, when you worked at Rock & River,

3  you prepared sushi rolls; right?

4      A.   Yes.

5      Q.   Was that your basic job there?

6      A.   Yeah.

7      Q.   Now, have you ever lived, ever, in Miami-Dade

8  County, Florida?

9      A.   No, just here.

10     Q.   In Broward?

11     A.   I don't know if Lauderhill is in Broward, but

12 I've lived in Lauderhill.

13     Q.   Okay.  So the last -- many, many years,

14 you've lived in the city Lauderhill, Florida?

15     A.   Yes.

16     Q.   Now, the restaurant location is just down the

17 street really from Lauderhill, isn't it, in Sunrise,

18 Florida?

19     A.   Yes.

20     Q.   Did you ever do any work at all for

21 Rock & River in Miami-Dade County?

22     A.   No.

23     Q.   So if someone were to say that all acts or

24 omissions giving rise to this dispute took place in

25 Miami-Dade County, that would be a false statement?

```
 1        A.    Yes.
 2        Q.    Now, in 2011, if Rock & River says that their
 3   gross annual sales were less than $500,000, can you
 4   dispute that?
 5        A.    I did not work in 2011.
 6        Q.    Okay.  So apparently, then, you have
 7   absolutely no idea what the gross annual sales of
 8   Rock & River were in 2011.
 9        A.    No.
10        Q.    Do you have any idea what the gross annual
11   sales of Rock & River were for any year?
12        A.    No, I don't know.
13        Q.    Now, since you had sued Mykonos then, when
14   you got the job at Rock & River, did you then decide,
15   I'm going to sue the Rock & River people after I quit
16   or am fired, too?
17        A.    How do you mean?  What are you asking me?
18        Q.    Yeah.  I'm asking you just that:  That you
19   worked for Mykonos, you sue, and you're able to settle
20   that case and get some money, so you must have thought,
21   hey, I'll just keep doing this, that now I'll go to
22   work for Rock & River, and when I -- if this job ever
23   ends somehow, I'm going to sue them for overtime,
24   too --
25              MR. FOX:  Object to form.
```

```
 1        Q.   Okay.  Now, when you prepared sushi, as

 2   you've already described it, you just prepared it for

 3   people -- customers who were there, present in the

 4   restaurant to eat it there; right?

 5        A.   Yes.

 6        Q.   So you weren't making any sort of sushi to

 7   ship or mail to someone that doesn't live here locally

 8   in Lauderhill or Sunrise?

 9             THE INTERPRETER:  I'm sorry.  Could you

10        repeat the question, please?

11             MR. KLEPPIN:  Sure.

12        Q.   So when you were making the sushi, you were

13   not making it so someone would mail it or send it via

14   Federal Express to someone who lived outside of the

15   local Lauderhill/Sunrise area?

16        A.   Just for customers.

17        Q.   Just for the local customers who would either

18   come and pick it up and go eat it at home, or go eat it

19   in the restaurant?

20        A.   Yeah.

21        Q.   So, then, you didn't have -- you didn't have

22   anything to do with, in any way, the actual movement of

23   any goods or services, when you worked at Rock & River,

24   with respect to the actual movement of them across

25   state lines?
```

```
 1              THE INTERPRETER:  I'm sorry.  Did you say
 2         state lines?
 3         A.    That's correct.
 4         Q.    You had told me before that you had no idea
 5    from whom the restaurant purchased any sort of utensils
 6    or food or drink products.  So I take it from that
 7    then, that you can't say whether any of those food or
 8    drink or utensils, those goods or materials, traveled
 9    through interstate commerce?
10         A.    Yes, that's correct.
11         Q.    Now, do you know how much it is, if this case
12    goes to trial, and -- You intend to come into the
13    courtroom and testify against Rock & River and ask the
14    jury to award you money; is that correct?
15              THE INTERPRETER:  I'm sorry.  The question
16         you presented, "Do you know how much it is if this
17         case goes to trial"?
18              MR. KLEPPIN:  I can rephrase it if you want.
19              THE INTERPRETER:  Yeah.  Rephrase it.
20         Q.    You intend, if this case goes that far, to go
21    into a courtroom and ask a jury to award you money
22    against Rock & River; is that true?
23         A.    Yes, correct.
24         Q.    And what is it?  How much money are you going
25    to ask the jury to award you in this case?  Do you
```

page 30 of 66

1    know?

2         A.   No.

3         Q.   You just don't have any idea?

4         A.   No.

5         Q.   Because Mr. Iwasaki and Rock & River would

6    like to know.  See, they're here today, and you've sued

7    them, and we're all here spending a lot of time and

8    money on the case, and defending it.  And as you sit

9    here, you literally have no idea whatsoever what you're

10   suing for and what you're going to ask the jury to

11   award you?

12             MR. FOX:  Object to form.

13        Q.   Is that what you're saying?

14        A.   No.

15        Q.   How much would you settle the case for?

16   Would you settle it for $5,000?

17        A.   I can't answer that.

18        Q.   Why can't you answer it?  What do you mean?

19        A.   Because I can't.

20        Q.   Well, would you settle it for $10,000?

21        A.   I can't answer that.

22        Q.   Okay.  Would you settle it for $50,000?

23        A.   I can't answer that.

24        Q.   Okay.  So I guess it's no then, you wouldn't.

25   I mean, if we put $5,000 in cash on the table and asked

```
1    you, would this be enough to settle the case, you're
2    saying you couldn't even say?
3              MR. FOX:  Object to form.
4         A.   Yes, that would be my answer.
5         Q.   Oh, yes, you would settle?
6         A.   No, no.  My answer is that I couldn't answer
7    it.
8         Q.   I see.  So you're saying you just can't say?
9         A.   Yes.
10        Q.   And that's true, even $50,000?  You're saying
11   if that were offered, you just can't say that you would
12   accept that to settle the case?
13             MR. FOX:  Object to form.
14        A.   Yes, I can't answer it.
15        Q.   And what about if the defendants offered you
16   $60,000 in cash or what's behind Door Number 2?  Is
17   that something --
18             MR. FOX:  Object to form.
19        Q.   -- that you would accept, or would you reject
20   that, too?
21        A.   I have no answer.
22        Q.   So you've never really even thought about
23   what it was you would want to -- I guess you can't say
24   remotely what on earth you would settle the case for if
25   you have no idea really what you're suing for.
```

1    A.   No.

2    Q.   Have you ever before attempted to calculate

3  what it is you're owed or allegedly owed?

4    A.   No.

5    Q.   And obviously then, you understand -- it's

6  clear.  It's because you're not owed anything.

7         MR. FOX:  Object to form.

8    Q.   If you were really owed something, you would

9  be able to tell me, hey, look, Mr. Kleppin, I know

10 exactly what they owe me to the penny, because they

11 didn't pay me something they were supposed to.

12   A.   I can't answer that question.

13   Q.   Okay.  So I guess you're saying you can't

14 answer that question.  I understand.  You're basically

15 saying, look, Mr. Kleppin, I really don't know whether

16 I'm owed anything or not, and that's why I just can't

17 answer your questions.

18        MR. FOX:  Object to form.

19   Q.   That's what you're saying?

20   A.   I can't answer that question.

21   Q.   Okay.  What do you mean?  Why couldn't you

22 answer that question, if that isn't the -- That could

23 be the only reason for why you're unable to articulate.

24        MR. FOX:  Object to form.

25   Q.   Isn't that true?

1      A.   I can't answer that question.

2      Q.   I realize that that question is a difficult

3  one to answer if you're not really owed anything, and

4  apparently that's why you're unable to answer it.  Is

5  that true?

6      A.   How do you mean?  I don't understand.

7      Q.   Okay.  In other words, it's -- I asked you

8  specifically.  It's pretty clear if you're unable to

9  say what it is that you're owed, or even if you're owed

10  anything -- and when I ask that, you say, I just can't

11  answer that.  So you must be telling me, Mr. Kleppin, I

12  just can't answer that because you really don't know if

13  you're owed anything or not.  Otherwise, you'd just

14  simply tell me what it is.  Isn't that true?

15      MR. FOX:  Object to form.

16      A.   I can't answer that question.

17      Q.   Okay.  So basically I think you're telling me

18  that the answer to the question is yes, with that

19  explanation?

20      MR. FOX:  Object to form.

21      A.   Yes, what?

22      Q.   Okay.  I see.  So, in other words, you're

23  saying, the answer to the question is yes, with that --

24  With that explanation, the answer is yes, and I just

25  can't answer that?

```
 1              MR. FOX:  Object to form.
 2         A.    I can't answer that.
 3         Q.    Do you know -- Let me ask the question -- ask
 4    it this way.  How much would you like from Rock &
 5    River?  Like is there an amount of money that, wow, if
 6    they paid me in cash today, put it right here on the
 7    conference room table, this amount of money, I'm not
 8    saying I would take that, but I would like that; wow,
 9    that would be like neat?
10              MR. FOX:  Object to form.
11         Q.    Could you explain?
12         A.    I can't answer that question.
13         Q.    Have you ever tried to sit down -- I know you
14    said you never tried to really calculate your damages,
15    or you've never calculated your damages, but have you
16    ever tried to sit down with anyone, a friend or even
17    yourself, and attempted in any way -- even attempted to
18    calculate what possibly you may be allegedly owed?
19         A.    Not right now.
20         Q.    So, in other words, you never have?
21         A.    No.
22         Q.    Is there anything that you're suing the
23    defendants for other than money?  Like do you want some
24    sort of an apology from them?  Do you want them to hire
25    you back?  Anything other than money that you're suing
```

```
 1   for?
 2        A.   I can't answer that.
 3        Q.   Well, this is really, though, the time for
 4   you to answer, see, because this is the one day I get
 5   to depose you and ask you these questions in the case.
 6   But the company representatives are here, and they'd
 7   like to know what it is that you're requesting in this
 8   lawsuit.  So if you don't know today, are you ever
 9   going to know what it is you're suing for, I guess is
10   the question?
11             MR. FOX:  Object to form.
12        A.   I can't answer the question.
13        Q.   Is it true that you want your job back at
14   Rock & River?
15        A.   No.
16        Q.   Have you asked anyone at Rock & River to get
17   your job back?
18        A.   No.
19        Q.   Are you doing anything to earn money other
20   than the Inverrary Rentals Company that you're working
21   for now?
22        A.   No.
23        Q.   So I take it then for the last ten years,
24   you've been in the country illegally, and you're
25   working here illegally?
```

```
 1              MR. FOX:  Object to form.
 2         A.   Yes.
 3         Q.   Are you doing anything to try to obtain legal
 4    status, either being here in the country physically
 5    legally and/or to be able to work here legally?
 6         A.   No.
 7         Q.   Do you intend to?
 8              MR. FOX:  Object to form.
 9         A.   No.  I don't have anything.
10         Q.   And I don't understand.  I think it's pretty
11    clear you don't want to do that because you want to
12    send the money back to Mexico, and you don't want to
13    pay taxes on it?
14              MR. FOX:  Object to form.
15         Q.   That's why, right?
16         A.   I can't answer that question.
17         Q.   Well, I don't understand.  What do you mean
18    you can't -- Really is what -- Whenever you've said
19    here today, "I can't answer that question," it's
20    because you really just refuse to answer it.  Is that
21    really what's going on?
22              MR. FOX:  Object to form.  The line of
23         questioning is falling outside of the proper scope
24         of discovery at this point.
25         A.   I don't know the answer.
```

 1          case.  He's not invoking any sort of privilege.
 2              MR. FOX:  He hasn't stated, but clearly his
 3          objection to the line of your questioning, he's
 4          invoking some type of privilege.
 5              MR. KLEPPIN:  I actually don't read it that
 6          way at all.  How could there be a privilege as to
 7          what you're suing for?
 8              MR. FOX:  We'll, you've asked the questions
 9          multiple times, and he's answered multiple times.
10              MR. KLEPPIN:  How could that be -- I don't --
11          He hasn't answered it.
12              MR. FOX:  He has.  You're asking the same
13          question repeatedly, which is a delving form of
14          harassment against my client.
15              MR. KLEPPIN:  Well, I'm not trying to harass
16          him.  I'm just trying to find out --
17              MR. FOX:  You keep asking the same question
18          multiple times in different versions and making
19          statements, and you are.
20              MR. KLEPPIN:  Well, no.  I don't like -- And
21          I object to the speaking objections.
22              MR. FOX:  I haven't made any speaking
23          objections.
24      BY MR. KLEPPIN:
25          Q.   Do you -- Are you under the impression that

```
 1    you can pick and choose what questions you can answer

 2    today?

 3              MR. FOX:  Object to form.

 4         A.   I can't answer that question.

 5         Q.   What do you mean you can't answer the --

 6    Well, let me ask it this way.  At any time during this

 7    deposition today, have you found certain questions that

 8    you would just rather not answer for whatever reason?

 9    Maybe you think they're difficult questions.  Maybe you

10    think answering it would hurt your case.  I don't know.

11              MR. FOX:  Object to form.

12         Q.   But have you -- And is that why you have

13    said, "I can't answer that question"?

14         A.   I can't answer this question either.

15         Q.   Okay.  What do you mean when you say you

16    can't answer the question?  Is that -- Because you're

17    not telling me you don't understand the question.

18         A.   You've made this question several times.  It

19    means that I can't answer the question.

20         Q.   Okay.  So you're saying you're not refusing

21    to answer the question based on some privilege or any

22    other reason, you're just saying you're just physically

23    unable to provide an accurate answer?

24         A.   I can't answer that question.

25         Q.   Okay.  Why is it that you can't answer my
```

 1    last question?  I don't understand.

 2          A.    Because we're going back and -- We're

 3    starting all over again.  I can't answer that question.

 4          Q.    Okay.  So you're saying -- Now you're telling

 5    me if you tell me, "I can't answer that question,"

 6    you're saying -- you're telling that to me if you

 7    believe I've asked you the question before in today's

 8    deposition?  Is that what you're saying?

 9          A.    Yes.

10          Q.    Oh, I see.  Okay.  So we will just have to

11    look at the record then, and whenever you say, "I can't

12    answer that," that just means you think I've asked it

13    before, and you've already answered it?

14          A.    Yes.

15          Q.    Do you understand that if you don't tell me

16    what you're suing for, how much money it is -- even

17    whatever, as we've gone through -- do you understand

18    that that means I'm precluded from being able to ask

19    you today any specifics about the information that you

20    would give in response to that question?

21                MR. FOX:  Object to form.

22                THE INTERPRETER:  Would you mind restating

23          that last part of the question?

24                MR. KLEPPIN:  Sure.

25          Q.    Do you understand that with respect to what

```
 1    you're suing for, and in particular damages and money,
 2    if that's part of what you're requesting, since you
 3    won't tell me what that is today, you're precluding me
 4    from being able to examine you and ask you questions
 5    about it today?  Are you aware of that?
 6         A.    I can't answer that question.
 7         Q.    You know, maybe it's this.  Is it true that
 8    if I were to ask you whether or not you're owed
 9    anything on any given week, would you not even be able
10    to guess?  Is that what's happening here?
11              MR. FOX:  Object to form.
12         A.    I can't answer that question.
13              MR. KLEPPIN:  Okay.  Why don't we take a
14         break for a few minutes, okay?
15              (Thereupon, a recess was taken from 11:20
16         a.m. until 11:26 a.m., after which the following
17         proceedings were had:)
18    BY MR. KLEPPIN:
19         Q.    Okay.  Let me ask you a couple questions
20    here, Mr. Torres.  Do you have any documents at all in
21    your possession that relate to any of the claims in
22    this lawsuit?
23         A.    How do you mean?
24         Q.    Oh, just that.  You know what documents are,
25    papers.
```

```
 1            A.    You mean do I have them?
 2            Q.    Yes.   Do you have them, possess them or have
 3      access to them, the ability to possess them, any
 4      documents that in any way relate or pertain to your
 5      lawsuit against Rock & River?
 6            A.    I have seen them, but I do not possess them.
 7      I don't have them in my power.
 8            Q.    Oh, well, where are they?
 9            A.    I can't answer that question.
10            Q.    Okay.   Well, so let me ask it this way.   I'll
11      rephrase it just slightly.   Do you have any documents
12      in your possession, custody or control that relate to
13      any of the allegations in your lawsuit?
14            A.    In my possession, no.
15            Q.    Well, possession, custody or control, is the
16      question.
17            A.    Not in my hands.
18            Q.    Do you have any documents in your possession,
19      custody or control that support the contentions that
20      you're making in your lawsuit?
21            A.    I can't answer that question.
22            Q.    Do you have any documents in your custody,
23      possession or control which are unfavorable or perhaps
24      negative, they're against any allegations or claims in
25      your lawsuit against Rock & River?
```

```
 1          A.   I can't answer that question.
 2          Q.   And why is it that you can't answer the
 3     question?
 4          A.   Because I can't.
 5          Q.   Well, is it because -- Is the answer really
 6     "I don't know"?
 7          A.   I can't answer that.
 8          Q.   Okay.  So you can't even say whether or not
 9     you don't know whether you have these documents I'm
10     asking you about?
11          A.   Can you repeat the question, please.
12          Q.   Sure.  You know, you have said today, a
13     number of times, in responses to questions, "I don't
14     know."  And there's nothing wrong with that answer, and
15     I'm not suggesting that there is.
16               You've said, on a number of occasions, "I
17     don't remember" to some of my questions, and that's
18     okay, as long as that's truthful.  There's nothing
19     wrong with that.  And then you've said to a number of
20     them that you just can't answer that.
21               And I'm just wondering -- I'm trying to get
22     to the bottom of -- now with these documents, if you're
23     saying you can't answer that because really the answer
24     is that you don't know whether there's documents in
25     your possession, custody or control, for example, that
```

```
 1    might be unfavorable to the allegations that you're
 2    making in the suit.  Can you explain, please?
 3         A.   I just can't answer that question.
 4         Q.   Do you know whether or not you ever received
 5    W-2 forms from Rock & River for the years 2012 through
 6    2014?
 7              THE WITNESS:  Okay.  What do you mean by
 8         "form"?  I -- Wait.  Let me give you a second.
 9         Maybe there's a language thing.
10              (Thereupon, a discussion was had between the
11         interpreter and the witness.)
12         A.   I never received a W-2 form.
13         Q.   You're saying you never did or you're not
14    sure if you did or not?
15         A.   I did not receive any form.
16         Q.   Well, do you know what a W-2 form even is?
17         A.   Okay.  You're saying I never -- I'm just
18    saying I never received a paper.
19         Q.   You never received a paper?  You're saying
20    you never received any sort of paper at all from
21    Rock & River during the entire time you worked there?
22         A.   No.
23         Q.   Do you know what a W-2 form is?
24         A.   No.
25         Q.   Do you have any correspondence between
```

```
 1    yourself and anyone who ever worked for Rock & River?
 2         A.    And what kind of communication or
 3    correspondence?
 4         Q.    Any.  Any at all.
 5         A.    No.
 6         Q.    Do you have any documents in your possession,
 7    custody or control which relate or refer to any claim
 8    that you made for any sort of governmental benefits --
 9              MR. FOX:  Object to form.
10         Q.    -- during the last three years?
11         A.    What do you mean?  Did I have a document
12    or --
13         Q.    Right, any sort of document.
14         A.    No.
15         Q.    Have you identified any documents in this
16    case that support your allegations?
17         A.    I can't answer that question.
18         Q.    And why is that?
19         A.    Because I can't.
20         Q.    Now, you do have records with respect to the
21    previous lawsuit that you had against Mykonos.  Your
22    attorney would have all of those; right?
23         A.    Yes, correct.
24         Q.    Do you know whether or not -- who paid the
25    filing fee to bring this suit?  Was it you or your
```

```
 1   attorney?
 2              MR. FOX:  Object to form.
 3        A.    I don't remember.
 4        Q.    Well, have you paid any money out of pocket
 5   to start or fund in any way this lawsuit?
 6        A.    No.
 7        Q.    Do you have any documents at all in your
 8   possession, custody or control which in any way even
 9   relate to your employment with Rock & River?
10        A.    No.
11        Q.    When you received the cash from Rock & River,
12   didn't you write down somewhere on a log or a sheet the
13   amount of cash that you received each week?
14        A.    No.
15        Q.    When you worked at Rock & River, did you ever
16   talk to anyone there about your pay?
17        A.    No.
18        Q.    So you never complained to anyone about your
19   pay?
20              MR. FOX:  Object to form.
21        A.    I can't answer that question.
22        Q.    Do you know in this case if you get awarded a
23   certain sum by the jury, is that then your money or
24   does your attorney get a percentage of that?
25              MR. FOX:  Object to form.
```

```
 1        A.   I don't know.
 2        Q.   Have you spoken to anyone about whether they
 3   would be a witness for you in the lawsuit?
 4        A.   I can't answer that question.
 5        Q.   Also, do you know why a moment ago, when I
 6   asked you, "did you talk to anyone about your pay at
 7   Rock & River," and you said "no," and then I asked,
 8   "did you complain to anyone at Rock & River about your
 9   pay," which is more narrow than the much broader
10   question, "did you talk to anyone about it at all," and
11   you said you couldn't answer, do you have a
12   recollection of complaining to anyone at Rock & River
13   about your pay?
14             MR. FOX:  Object to form.
15        A.   I don't remember.
16        Q.   Have you ever seen Rock & River perform any
17   work outside the State of Florida?
18        A.   I don't know.
19        Q.   Well, why don't you just think about it a
20   minute.
21        A.   I don't know.
22        Q.   Okay.  So you're saying whether or not
23   Rock & River performed any work outside of the State of
24   Florida -- I see.  You're saying you don't know whether
25   they did or not, meaning you didn't see any yourself,
```

```
 1    whether they were doing it, and you just don't know
 2    about it, you can't say.  Is that what you're telling
 3    me?
 4         A.   I really don't know.  I don't know what they
 5    do.  I'm just an employee.  I don't know what work they
 6    do outside.  So I'm just an employee.  I don't know.  I
 7    can't answer that.
 8         Q.   Do you know what it means for a company to be
 9    engaged in interstate commerce?
10         A.   I don't know.
11         Q.   Do you know what it means for a company to be
12    engaged in commerce?
13         A.   I don't know.
14         Q.   Do you know what it means for a company to
15    substantially effect interstate commerce?
16              THE INTERPRETER:  I'm sorry.  Did you say
17         affect or effect?
18              MR. KLEPPIN:  Uh-huh.
19         A.   No, I don't know.
20         Q.   Is it true that when you worked for
21    Rock & River, you were not involved in trade, commerce,
22    transportation or communication between Florida and any
23    point outside of Florida?
24              MR. FOX:  Object to form.
25         A.   I don't understand.  What do you mean, that
```

```
 1    if I participated in actually transporting or carrying

 2    or doing something with the merchandise?  I don't

 3    understand.

 4         Q.   Yes, that's exactly right.  Were you involved

 5    in -- When you worked at Rock & River, were you

 6    involved in trade, commerce, transportation or

 7    communication between Florida and any point outside of

 8    Florida?

 9         A.   No.

10         Q.   When you worked for Rock & River, were you

11    involved in the transportation of goods or services

12    across state lines?

13         A.   No.

14         Q.   When you worked at Rock & River, was it

15    pretty clear to you that the -- Rock & River, the

16    little one location restaurant, was serving the local

17    community?

18         A.   Meaning only clients from the area would go?

19         Q.   Yes.

20         A.   I can't say.

21         Q.   Well, is it true that Rock & River was not

22    engaged in the production of any goods?

23         A.   I don't know.

24         Q.   Do you know whether or not the Fair Labor

25    Standards Act applies to Rock & River during the time
```

```
 1    you worked there?
 2         A.   I don't know.
 3         Q.   When you worked for Rock & River, were you
 4    only assigned to work in the State of Florida?
 5         A.   Yes, only here.
 6         Q.   When you worked at Rock & River, did you
 7    yourself ever witness Rock & River selling any of the
 8    food that it prepared to customers or clients outside
 9    of the State of Florida?
10         A.   I don't know.
11         Q.   When you worked at Rock & River, did you ever
12    see Rock & River solicit any clients or customers from
13    outside the State of Florida?
14         A.   I don't know.
15         Q.   Did you ever see Rock & River perform any
16    work outside the State of Florida?
17         A.   I don't know.
18         Q.   Did you ever see Rock & River produce any
19    goods or provide any services outside the local South
20    Florida area?
21         A.   I don't know.
22         Q.   Do you know whether or not you ever provided
23    a presuit demand to Rock & River asking for any monies
24    that they owed you before suit was filed?
25         A.   No.
```

```
 1              Give me five minutes.  I just need a break for
 2         five minutes, and then we'll come back, and we'll
 3         just finish it up in about a half an hour, okay?
 4              (Thereupon, a recess was taken from 12:00
 5         p.m. until 12:06 p.m., after which the following
 6         proceedings were had:)
 7    BY MR. KLEPPIN:
 8         Q.   Mr. Torres, with respect to the pay that you
 9    would receive each week in cash late on Sunday night,
10    early Monday morning, as you've testified, do you know
11    how much of that money was designed to compensate you
12    for any hours that you would have worked over 40?
13         A.   Meaning that they paid my overtime there, or
14    what do you mean?
15         Q.   I just want to know how many -- of the pay
16    that you would get each week, do you know what hours
17    that was intended to compensate you for.  Do you know?
18         A.   No, I don't know.
19         Q.   Okay.  Can you describe in detail each act or
20    omission on the part of Rock & River that you believe
21    supports your claim?
22         A.   No.
23         Q.   Do you know the phone number for Juan Luis
24    Casado?
25         A.   I don't know.
```

```
 1        Q.   Do you know the phone number for Carla
 2   Yasmin?
 3        A.   I don't know.
 4        Q.   Do you know the number for Romeo Telles?
 5        A.   No, nobody's.
 6        Q.   And Julio?
 7        A.   No.
 8        Q.   And so if I were to ask you to please state
 9   each item of damage that you claim in the case, that's
10   something that you wouldn't be able to do?
11        A.   Correct.
12        Q.   Now, do you believe that you yourself were
13   engaged in interstate commerce when you worked at
14   Rock & River?
15        A.   What do you mean, outside of Florida?
16        Q.   Well, I didn't ask outside of Florida.
17             THE INTERPRETER:  I'm sorry.  When you say
18        interstate --
19             MR. KLEPPIN:  The question was -- Oh, I see.
20        You're saying -- I gotcha.  Yeah.  Well --
21        A.   No, I don't know.
22        Q.   Okay.  Are you in any way contending that
23   Rock & River was engaged in interstate commerce when
24   you worked there?
25        A.   I don't know.
```

1        Q.    So you're bringing suit really without having

2    any idea what it is that you're owed?

3              MR. FOX:  Objection, asked and answered.

4        A.    I can't answer that question.

5              MR. KLEPPIN:  No further questions.  Okay.

6              MR. FOX:  He waives his right to read the

7    transcript.

8              MR. KLEPPIN:  All right.  No problem.

9              MR. FOX:  We don't request a copy.

10                       STIPULATION

11             It is hereby stipulated by and between

12   counsel for the respective parties and the witness that

13   the reading and signing of the foregoing deposition and

14   notice of filing be, and the same are, hereby waived.

15             (Deposition was concluded at 12:22 p.m.)

16                       + + + +

17

18

19

20

21

22

23

24

25

NAME _Daniel_

NO. _____ DATE _____

Extra or Lost Time ... Regular Time

NAME _Daniel_

NO. _____ DATE _____

Extra or Lost Time ... Regular Time

TOTAL "OUT" REGISTRATIONS

TOTAL "IN" REGISTRATIONS

"OUT" minus "IN" = NET TIME

NOTE: REGISTRATIONS MUST BE 0.23 HRS. AND 10 HRS. OR HR.
OfficeMax



DEFENDANT'S
EXHIBIT NO. 1
FOR IDENTIFICATION
DATE: 1/26/16   RPTR: CA

**NAME** Daniel

**NAME** Daniel



NAME _Daniel_

NO. _____ DATE _____

Extra or Lost Time | Regular Time

NAME _Daniel_

NO. _____ DATE _____

Extra or Lost Time | Regular Time

TOTAL "OUT" REGISTRATIONS

TOTAL "IN" REGISTRATIONS

"OUT" minus "IN" = NET TIME

NOTE: REGISTRATIONS MUST BE 0.23 HRS. AND 10THS OR 100THS OF HR.

9875



NAME Daniel

NO. DATE 9/ 9/17

| Extra or Lost Time | Day | | | Regular Time |
|---|---|---|---|---|
| m 4.00 130 (9.5) | 1st DAY | IN / OUT / IN | AM / NOON | 4.00 130 (9.5) |
| m 400 130 (9.5) | | OUT | PM | 4.00 130 (9.5) |
| J 4.00 130 (9.5) | 2nd DAY | IN / OUT / IN | AM / NOON | 4.00 130 (9.5) |
| V 4.00 130 (9.5) | 3rd DAY | OUT / IN | PM / AM / NOON | 4.00 145 (9.75) |
| S 4.00 145 (9.75) | | OUT / IN | PM / AM | 4.00 145 (9.75) |
| 4.00 130 (9.5) | 4th DAY | OUT / IN | NOON | 4.00 130 (9.5) |
| (57.25) | | OUT | PM | (57.5) |
| m 4.00 (9.5) | 5th DAY | IN / OUT / IN | AM / NOON | m 4.00 130 (9.5) |
| m 4 130 (9.5) | | OUT / IN | PM / AM | m 4.00 130 (9.5) |
| J 4.00 130 (9.5) | 6th DAY | OUT / IN / OUT | NOON / PM | 4.00 130 (9.5) |
| 4.00 145 (9.75) | 7th DAY | IN / OUT / IN | AM / NOON | V 4.00 145 (9.75) |
| 4.00 45 (9.75) | | OUT | PM | 3.30 (10.5) |

Reg. Hrs. — Rate — Amount
Extra Hrs. — Rate — Amount
Total
Fed. Old Age Ben.
Fed. Withholding Tax
State Withholding Tax
Insurance
Government Bonds
Miscellaneous
Net Wages

TOTAL "OUT" REGISTRATIONS

TOTAL "IN" REGISTRATIONS 130

"OUT" minus "IN" = NET TIME 4.00 130 (9.5)

NOTE: REGISTRATIONS MUST BE 1-23 HRS. AND 10THS OR 100THS OF HR.

9075 adams

57.75 58 4.00 130

NAME Daniel

NO. DATE

| Extra or Lost Time | Day | | | Regular Time |
|---|---|---|---|---|
| m 4.00 130 (9.5) | 1st DAY | IN / OUT / IN | AM / NOON | 4.00 130 (9.5) |
| m 4.00 130 (9.5) | | OUT / IN | PM / AM | m 4.00 1.30 (9.5) |
| J 4.00 130 (9.5) | 2nd DAY | OUT / IN | NOON | 4.00 130 (9.5) |
| V 4.00 145 (9.75) | 3rd DAY | OUT / IN / OUT / IN | PM / AM / NOON | 4.00 145 (9.75) |
| S 4.00 145 (9.75) | | OUT / IN | PM / AM | 4.00 130 (9.5) |
| 9.75 | 4th DAY | OUT / IN | NOON | 4.00 130 (9.5) |
| 57.75 | | OUT | PM | (57.75) |
| m 4.00 (9.5) | 5th DAY | IN / OUT / IN | AM / NOON | 4.00 130 (9.5) |
| J 4.00 130 | 6th DAY | OUT / IN / OUT / IN | PM / AM / NOON | 4.00 130 (9.5) |
| 4.00 2.15 (10.25) | 7th DAY | OUT / IN / OUT / IN | PM / AM / NOON | 4.00 130 (9.5) 4.00 145 (9.75) |
| 3.30 (10.25) | | OUT | PM | |

Reg. Hrs. — Rate — Amount
Extra Hrs. — Rate — Amount
Total
Fed. Old Age Ben.
Fed. Withholding Tax
State Withholding Tax
Insurance
Government Bonds
Miscellaneous
Net Wages

TOTAL "OUT" REGISTRATIONS 4.00 (9.5)

TOTAL "IN" REGISTRATIONS 130

"OUT" minus "IN" = NET TIME 57.25

NOTE: REGISTRATIONS MUST BE 0-23 HRS. AND 10THS OR 100THS OF HR.

9675 adams 58.5



NAME _Daniel_  NO. _____ DATE _____

NAME _Daniel_  NO. _____ DATE _____



NOTE: REGISTRATIONS MUST BE 0.23 HRS. AND 10THS OR 100THS OF HR.
9675  Adams

NOTE: REGISTRATIONS MUST BE 0.23 HRS. AND 10THS OR 100THS OF HR.
9675  Adams

NAME _Daniel_

NO. _____ DATE _____

| Extra or Lost Time | | Regular Time |
|---|---|---|

NAME _Daniel_

NO. _____ DATE _____

| Extra or Lost Time | | Regular Time |
|---|---|---|

TOTAL "OUT" REGISTRATIONS

TOTAL "IN" REGISTRATIONS

"OUT" minus "IN" = NET TIME

**Left card:**

NAME _____

NO. _____ DATE _____

| Extra or Lost Time | | | Regular Time |
|---|---|---|---|

**Right card:**

NAME Daniel

NO. _____ DATE _____

| Extra or Lost Time | | | Regular Time |
|---|---|---|---|

TOTAL "OUT" REGISTRATIONS

TOTAL "IN" REGISTRATIONS

"OUT" minus "IN" = NET TIME

NOTE: REGISTRATIONS MUST BE 0.25 AND TENTHS OF AN HOUR.

2

NAME _Daniel_

NO. _____ DATE _____

| Extra or Lost Time | | | | Regular Time |
|---|---|---|---|---|
| M 4.15 | 9:25 | 1st DAY | IN / AM | 4.45 |
| 130 | | | OUT / NOON | 1.50  9 |
| M 4.00  95 | | 2nd DAY | IN / AM | M 4.30 |
| 130 | | | OUT / NOON | 130  9 |
| 4.00  95 | | | IN | 4.00 |
| 130 | | | OUT / PM | 130  95 |
| 4.00  95 | | 3rd DAY | IN / AM | 4.0  9 |
| 130 | | | OUT / NOON | 1.50  95 |
| 4.00  95 | | | IN | 4.00 |
| 130 | | 4th DAY | OUT / AM | 9.00  10 |
| (47.25) | | | NOON | 5.50 |
| 4.3 | | | OUT / PM | 1.45  10:30 |
| | | 5th DAY | IN / AM | 47.25 |
| | | | OUT / NOON | 4.25 |
| | | | IN | 130  9 |
| 130 | | | OUT / PM | |
| M 4.00 | | 6th DAY | IN / AM | M 4.00  95 |
| 130 | | | OUT / NOON | 130  95 |
| | | | OUT / PM | M 4.00  95 |
| 4.00  95 | | | IN / AM | 130 |
| 130 | | 7th DAY | OUT / NOON | 4.00  95 |
| 4.00 | | | IN | 130  95 |
| 150 | | | OUT / PM | 4.00  95 |

TOTAL "OUT" REGISTRATIONS  135  865

TOTAL "IN" REGISTRATIONS

"OUT" minus "IN" = NET TIME  5 4.00  95

NOTE: REGISTRATIONS MUST BE 0.25 HRS. AND 10THS OR 100THS OF HR.
5675

NAME _____

NO. _____ DATE _____

| Extra or Lost Time | | | | Regular Time |
|---|---|---|---|---|
| | | 1st DAY | IN / AM | |
| | | | OUT / NOON | |
| | | | IN | |
| | | | OUT / PM | |
| | | 2nd DAY | IN / AM | |
| | | | OUT / NOON | |
| | | | IN | |
| | | | OUT / PM | |
| | | 3rd DAY | IN / AM | |
| | | | OUT / NOON | |
| | | | IN | |
| | | | OUT / PM | |
| | | 4th DAY | IN / AM | |
| | | | OUT / NOON | |
| | | | IN | |
| | | | OUT / PM | |
| | | 5th DAY | IN / AM | |
| | | | OUT / NOON | |
| | | | IN | |
| | | | OUT / PM | |
| | | 6th DAY | IN / AM | |
| | | | OUT / NOON | |
| | | | IN | |
| | | | OUT / PM | |
| | | 7th DAY | IN / AM | |
| | | | OUT / NOON | |
| | | | OUT / PM | |

TOTAL "OUT" REGISTRATIONS

TOTAL "IN" REGISTRATIONS

"OUT" minus "IN" = NET TIME

NOTE: REGISTRATIONS MUST BE 0.25 HRS. AND 10THS OR 100THS OF HR.
5675